**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

**KIMBERLY A. KELLY,**
    **Plaintiff,**

**v.**         **CIVIL NO. 3:14-CV-01677-P-BK**

**CAROLYN COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**
     **Defendant.**

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

   This case has been referred to the undersigned for Findings, Conclusions, and Recommendation on the parties' cross motions for summary judgment.  For the reasons that follow, it is recommended that Plaintiff's *Motion for Summary Judgment*, Doc. 10, be **GRANTED**, Defendant's *Motion for Summary Judgment*, Doc. 12, be **DENIED**, and the Commissioner's decision be **REVERSED AND REMANDED**.

## I.  BACKGROUND

**A.**  **Procedural History**

   Plaintiff filed an application for disability insurance benefits (DIB) in June 2011, alleging a disability onset date of March 10, 2010.  Doc. 8-6 at 2-3.[1]  Her application was denied at all administrative levels, and she now appeals to the United States District Court pursuant to 42 U.S.C. § 405(g).  Doc. 8-3 at 2-7, 12-26; Doc. 8-5 at 2-6, 9-13.

**B.**  **Facts**

   Plaintiff was 46 years old on the date of her disability onset.  Doc. 8-6 at 2.  She graduated from high school and had a certificate in cosmetology.  Doc. 8-3 at 34-35; Doc. 8-7 at

---

[1]  The following background comes from the transcript of the administrative proceedings, which can be found at Doc. 8.

4. Her past relevant work was as a mail handler/processing clerk.  Doc. 8-3 at 53; Doc. 8-7 at 4.

Dr. Kenneth Kippels began treating Plaintiff in March 2010 for her complaints of pain, skin

conditions, and hair loss.  Doc. 8-8 at 61.  Plaintiff also stated that her sleep was unrefreshing.

Doc. 8-8 at 62.  Dr. Kippels's examination of Plaintiff revealed diffuse hair thinning, dry eyes, a

tumor on the roof of her mouth, abdominal bloating, varicose veins, pedal edema, and 16 out of

18 positive tender points associated with fibromyalgia.[2]  Doc. 8-8 at 61-62.  Dr. Kippels

diagnosed Plaintiff with fibromyalgia meeting the American College of Rheumatology standard,

hypothyroidism, adrenal fatigue, and menopause.  Doc. 8-8 at 62.  The following month, Plaintiff

stated that her sleep was improved on the medication Dr. Kippels had prescribed.  Doc. 8-8 at 60.

Recent blood testing revealed that she had low T3 syndrome with high reverse T3, adrenal

fatigue with evidence of low cortisol, and high insulin.  Doc. 8-8 at 60.  In May 2010, Plaintiff

reported that her sleep was "pretty good," and her cognition was a little better.  Doc. 8-8 at 59.

In addition to his previous diagnoses, Dr. Kippels diagnosed Plaintiff with chronic fatigue

syndrome.[3]  Doc. 8-8 at 59.  In June 2010, Plaintiff stated that her sleep was "pretty good," she

was not taking the prescription sleep aid every day, her pain was better and she was able to do

more, her headaches were more mild, and her cognition was a bit better.  Doc. 8-8 at 58.

      In September 2010, Plaintiff's blood test was positive for the Epstein-Barr virus and there

was evidence that she had several infections.  Doc. 8-8 at 56.  By November 2010, Plaintiff

---

[2] Symptoms of fibromyalgia include "trouble sleeping, morning stiffness, headaches, painful menstrual periods, tingling or numbness in hands and feet, and problems with thinking and memory. The causes of fibromyalgia are unknown." *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 391 n.1. (5th Cir. 2007).

[3] "Chronic fatigue syndrome is a disorder causing profound fatigue that is not improved by rest and that may be worsened by physical or mental activity.  A person suffering from chronic fatigue syndrome may experience muscle pain, headaches, sore throat, tender lymph nodes, multi-joint pain, problems with concentration or memory, and post-exertional fatigue lasting more than twenty-four hours.  The causes are unknown." *Corry*, 499 F.3d at 392 n.2.

reported that she was "somewhat" improved, but Dr. Kippels doubted that she would be able to return to either full-time or part-time work.  Doc. 8-8 at 55.  Her pain was "about the same," and she was doing more activity despite the pain being a limiting factor.  Doc. 8-8 at 55.  She had decreased concentration and was taking various medications to improve her immune system and fight viral and bacterial infections.  Doc. 8-8 at 55.  In February 2011, Plaintiff stated that although she slept well, she felt sluggish in the morning.  Doc. 8-8 at 54.  Her pain increased with activity, and she continued to take prescription medication to fight various infections.  Doc. 8-8 at 54.  In May 2011, Plaintiff reported that her energy was still low, and she was sleeping ten to 12 hours a night.  Doc. 8-8 at 53.  She stated that she was engaging in more activity despite her pain, although she had to rest about every hour.  Doc. 8-8 at 53.  Dr. Kippels doubled the dosage of the medication that helped with Plaintiff's lung function and fought the Epstein-Barr virus.  Doc. 8-8 at 53.

In a May 2011 letter submitted on behalf of Plaintiff's DIB application, Dr. Kippels opined that Plaintiff has been disabled since December 2009 due to chronic fatigue syndrome and fibromyalgia.  Doc. 8-8 at 23.  He noted that she started having symptoms after likely contracting Lyme disease from an infected tick, which resulted in immune dysfunction and pituitary dysfunction.  Doc. 8-8 at 23.  Dr. Kippels noted that this led to the further reactivation of viral infections and an intracellular bacterial infection which produced neurotoxins that worsened her fatigue, sleep, and cognition.  Doc. 8-8 at 23.  Further, the pituitary dysfunction resulted in multiple hormonal deficiencies that also contributed to her symptoms.  Doc. 8-8 at 23.  Dr. Kippels noted that Plaintiff's severe immune dysfunction rendered her unable to eradicate infections that could normally be fought off, she had severe dysfunction of her cellular immunity, and she was treated for these dysfunctions with directed nutraceuticals, very high

doses of antibiotics and antivirals, immune boosting medications, and potent intravenous treatments.  Doc. 8-8 at 24-25.  The doctor concluded that Plaintiff "was certainly unable to perform the material and substantial duties of any regular occupation due to her sickness."  Doc. 8-8 at 26.  In numerous footnotes appended to his letter, Dr. Kippels cited to a variety of medical literature in support of his findings.  Doc. 8-8 at 26-30.

At a doctor's appointment in August 2011, Plaintiff stated that her pain was "different," but getting better overall.  Doc. 8-8 at 88.  She stated that her "brain fog" was worse and she was experiencing some dizziness.  Doc. 8-8 at 88.  Plaintiff was no longer taking medication for viral or bacterial infections at that time.  Doc. 8-8 at 88.  In December 2011, Dr. Kippels completed a Multiple Impairment Questionnaire.  He diagnosed Plaintiff with chronic fatigue syndrome, fibromyalgia, hypothyroidism, low cortisol state, menopause, and chronic Epstein-Barr virus.  Doc. 8-8 at 89.  Clinical findings included severe chronic fatigue of six months or longer with other medical conditions excluded, impairment of short-term memory, tenderness of the neck and axillary lymph nodes, muscle pain, multi-joint pain, headaches, post-exertional fatigue, 16 out of 18 tender points, and unrefreshing sleep.  Doc. 8-8 at 89-90.  Dr. Kippels identified various blood test results which he indicated supported his diagnosis, and he noted that Plaintiff's primary symptoms were muscle pain, stiffness, and daytime fatigue all rated as ten on a ten-point scale, gastrointestinal disturbance, and impaired concentration, which he rated as eight out of ten.  Doc. 8-8 at 90.  Dr. Kippels reported that these symptoms and limitations had been present since March 2010.  Doc. 8-8 at 95.

Dr. Kippels opined that Plaintiff was able to sit for two hours total and stand/walk for two hours in an eight-hour workday and would need to rest for an hour before sitting again.  Doc. 8-8 at 91-92.  She could occasionally lift ten pounds and carry five pounds.  Doc. 8-8 at 92.  Plaintiff

also had significant limitations with repetitive reaching, handling, fingering, and lifting due to pain and fatigue.  Doc. 8-8 at 92.  Additionally, Dr. Kippels found that Plaintiff was significantly limited in using her upper extremities for grasping, turning, and twisting objects, performing fine manipulations, and reaching.  Doc. 8-8 at 92-93.

He noted that Plaintiff's pain was severe in intensity and lasted throughout the day, was worsened by activity, and hurt all over her body.  Doc. 8-8 at 90-91.  The doctor rated Plaintiff's pain at between five and six on a ten-point scale, and her level of fatigue as a six.  Doc. 8-8 at 91. Dr. Kippels stated that Plaintiff's pain, fatigue, or other symptoms were frequently to constantly severe enough to interfere with her attention and concentration.  Doc. 8-8 at 94.  He opined that she is not a malingerer and was frustrated that she was not able to work outside the home, but she was incapable of tolerating even low stress, which worsened her pain and fatigue.  Doc. 8-8 at 94.  Dr. Kippels found that Plaintiff required unscheduled breaks to rest approximately every two hours for one hour during an eight-hour day and, while she had good and bad days, she would be absent from work, on average, more than three times a month.  Doc. 8-8 at 94-95.

Dr. Paul Patrick, D.O., performed a consultative examination of Plaintiff in October 2011, during which Plaintiff demonstrated tenderness to palpation in numerous areas.  Doc. 8-8 at 71.  Dr. Patrick diagnosed Plaintiff with, *inter alia*, fibromyalgia, chronic neck pain with a history of herniated disc, adrenal dysfunction, immunodeficiency, and hypothyroidism.  Doc. 8-8 at 72.  He stated that Plaintiff was limited to sitting for one to two hours, standing for 30 minutes or less, walking a distance of one block, and lifting five pounds or less.  Doc. 8-8 at 72.

Rheumatologist Dr. Lige Rushing evaluated Plaintiff in July 2012.  Plaintiff informed him that she had widespread pain involving "almost her entire body," which she rated as seven out of ten when resting and nine out of ten when active.  Doc. 8-8 at 113.  She also had fatigue

rated as seven out of ten that was not relieved with rest, and she needed to take breaks while doing household chores throughout the day.  Doc. 8-8 at 113.  Dr. Rushing's examination revealed that Plaintiff had tenderness on palpation of multiple joints and tenderness on palpation of 16 out of the 18 points associated with fibromyalgia.  Doc. 8-8 at 115.  Dr. Rushing opined that Plaintiff clearly met the criteria for a diagnosis of fibromyalgia, and she could not return to her work as a postal clerk.  Doc. 8-8 at 117.  He recommended treatment with exercise, psychological care, and medication.  Doc. 8-8 at 117.

C.      **Administrative Hearing**

Plaintiff testified that she is unable to work due to her fibromyalgia, chronic fatigue syndrome, and an autoimmune dysfunction.  Doc. 8-3 at 37.  She had recently been approved for disability benefits through her former job at the U.S. Postal Service.  Doc. 8-3 at 37.  Plaintiff stated that she got sick easily so she did not go out much, namely she got strep throat for about a week out of every month.  Doc. 8-3 at 48-49.  She described having pain in her shoulders, neck, head, and from the waist to knees and stated that she had difficulties turning her head.  Doc. 8-3 at 49-50.  Plaintiff testified that she could sit for 30 minutes, walk about 20 minutes before she needed to stop and rest, and she is exhausted all the time, even after sleeping for 12 hours.  Doc. 8-3 at 50-51.  She only goes to church if she feels well enough, which is less than once a month, and she sleeps from midnight until noon every day.  Doc. 8-3 at 44, 46.  She watches two to three hours of television a day, reads on occasion, and uses a computer for about 30 minutes a day. Doc. 8-3 at 46-47.

The vocational expert (VE) testified that an individual of Plaintiff's age, education, and work history who was limited to light work, except that she could only stand and walk for two hours, could not perform Plaintiff's past work, but could work as an order clerk, a lens inserter,

and a cutter/paster. Doc. 8-3 at 54-55. The VE stated that an individual who was absent from work more than three days a month could not work. Doc. 8-3 at 55.

D.   **The ALJ's Findings**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. Doc. 8-3 at 14. At step two, the ALJ determined that Plaintiff's severe impairments included fibromyalgia, chronic fatigue syndrome, and adrenal dysfunction. Doc. 8-3 at 14. At step three, the ALJ found that Plaintiff's severe impairments did not meet or equal the requirements of any listed impairment for presumptive disability. Doc. 8-3 at 15-16. Next, the ALJ determined that Plaintiff's allegations regarding her limitations were not credible to the extent alleged and, based on the evidence as a whole, she retained the residual functional capacity (RFC) to perform a range of light work, but was limited to standing/walking for four hours in an eight-hour workday. Doc. 8-3 at 16, 19-22. In rejecting Dr. Kippels's opinion, the ALJ noted that the doctor may have simply been trying to help his patient out of sympathy for her, or Plaintiff could have demanded a supportive note and Dr. Kippels provided one to avoid a conflict. Doc. 8-3 at 19. At step four, relying on the VE's testimony, the ALJ found that Plaintiff could not perform her past relevant work as a mail handler. Doc. 8-3 at 24. At step five, again relying on the VE, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including order clerk, lens inserter, and cutter/paster. Doc. 8-3 at 25-26. Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. Doc. 8-3 at 25.

## II.  APPLICABLE LAW

An individual is disabled under the Act if, *inter alia*, she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment" which has lasted or can be expected to last for at least 12 months.  42 U.S.C.
§ 423(d)(1)(A).  In order to qualify for a period of disability and DIB, a claimant must prove that
her disability began on or before the date his insured status expired.  *See* 42 U.S.C. §§ 423(a),
(c); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); 20 C.F.R. § 404.131.

 The Commissioner uses the following sequential five-step inquiry to determine whether a
claimant is disabled:  (1) an individual who is working and engaging in substantial gainful
activity is not disabled; (2) an individual who does not have a "severe impairment" is not
disabled; (3) an individual who "meets or equals a listed impairment in Appendix 1" of the
regulations will be considered disabled without consideration of vocational factors; (4) if an
individual is capable of performing her past work, a finding of "not disabled" must be made; (5)
if an individual's impairment precludes her from performing her past work, other factors
including age, education, past work experience, and residual functional capacity (RFC) must be
considered to determine if any other work can be performed.  *Wren v. Sullivan*, 925 F.2d 123,
125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f)).

 Under the first four steps of the analysis, the burden of proof lies with the claimant.
*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  The analysis terminates if the
Commissioner determines at any point during the first four steps that the claimant is disabled or
is not disabled.  *Id.*  If the claimant satisfies her burden under the first four steps, the burden
shifts to the Commissioner at step five to show that there is other gainful employment available
in the national economy that the claimant can perform.  *Greenspan v. Shalala*, 38 F.3d 232, 236
(5th Cir. 1994).  This burden may be satisfied either by reference to the Medical-Vocational
Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga
v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.   *Greenspan*, 38 F.3d at 236; 42 U.S.C. §§ 405(g), 1383(C)(3).   Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.   *Leggett*, 67 F.3d at 564.   Under this standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.   *Greenspan*, 38 F.3d at 236.

### III.   ARGUMENT AND ANALYSIS

Plaintiff presents two arguments in support of reversing the ALJ's decision:  (1) the ALJ erred in weighing the medical evidence; and (2) the ALJ erred in assessing Plaintiff's credibility. Because this case can be resolved on the first ground, the second issue need not be addressed.

In regard to Issue 1, Plaintiff first argues that the ALJ erred in failing to accord Dr. Kippels's medical opinions proper weight and by improperly suggesting that the doctor's opinions were based on sympathy for Plaintiff or to avoid conflict with her.   Doc. 11 at 12-14. Additionally, Plaintiff contends that the ALJ used boilerplate language in rejecting Dr. Kippels's medical opinions and incorrectly concluded that the doctor's opinions were not rooted in objective evidence and clinical findings.   Doc. 11 at 13, 15.  Plaintiff also points out that the only evidence in the record that contradicts Dr. Kippels's opinions is the reports of two non-examining physician consultants, and such findings do not constitute substantial evidence sufficient to uphold the denial of benefits.   Doc. 11 at 16-17.  Finally, Plaintiff notes that the ALJ

erred in failing to consider the opinions of the agency's own examining physician, Dr. Patrick, which also favored Plaintiff.[4] Doc. 11 at 17-18.

Defendant responds that the ALJ properly declined to attribute controlling weight to Dr. Kippels's opinion because there was insufficient objective medical evidence that Plaintiff's medical problems are disabling, and the evidence that the doctor relied on consists merely of Plaintiff's subjective complaints and lab test results that were not explained. Doc. 12 at 10-11. On the other hand, a physical examination of Plaintiff by Dr. Patrick revealed that, while she did have fibromyalgia, she had a normal gait and could perform toe walking, squatting, hopping, and tandem walking; her neurological examination was normal with normal sensation and cranial nerves; her knees, ankles, shoulders, elbows, and wrists had a full range of motion; and she had normal grip strength and motor strength, all of which support the ALJ's finding that Plaintiff is not disabled. Doc. 12 at 11. Additionally, Defendant asserts that it was reasonable for the ALJ to opine about Dr. Kippels's motivation given the lack of medical evidence in the record to support the doctor's conclusions regarding the severity of Plaintiff's condition. Doc. 12 at 11-12. Defendant concludes that the ALJ permissibly discredited Dr. Kippels's opinion because it was inconsistent with his own findings and the record as a whole and was, instead, based on Plaintiff's subjective complaints. Doc. 12 at 13-14.

In assessing RFC, "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted). However, a

---

[4] Plaintiff additionally argues that the ALJ erred by failing to apply the six-factor test set forth in 20 C.F.R. 404.1527(d) in rejecting her treating physician's opinion. Doc. 11 at 17. Because this issue can be resolved without reaching that question, the undersigned declines to address it.

treating physician's opinion may be given little or no weight "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56. Even if a treating physician's opinion is not given controlling weight, in many cases it should be given the greatest weight after being weighed using all of the factors provided in 20 C.F.R. § 404.1527.

As an initial matter, it is not clear what weight the ALJ accorded to Dr. Kippels's opinion as he stated that it was given "the weight merited by the overall evidence" and that "greater weight" was given to the opinions of the non-examining state agency consultants. Doc. 8-3 at 24. In any event, the ALJ's opinion reveals a fundamental misunderstanding about the nature of fibromyalgia. As the Court of Appeals for the Fifth Circuit has recognized, the manner of the illness is such that objective medical evidence is often not available and a claimant's subjective evidence must be considered. *See Corry*, 499 F.3d at 400 (noting that benefits carrier had to have considered the claimant's subjective evidence of fibromyalgia because it accepted physician reports of that diagnosis, and fibromyalgia findings involve an "inherently subjective" inquiry). Moreover, there actually was objective medical evidence available in this case, namely Plaintiff's bloodwork results which revealed that her insulin, sex hormone, cortisol, iron, and lipid levels were all abnormal and that she had the Epstein-Barr virus and numerous other infections. Doc. 8-8 at 56, 60, 90.

Moreover, contrary to the ALJ's findings, Dr. Kippels frequently noted how Plaintiff was responding to treatment, and there is absolutely no suggestion in the medical records or elsewhere that Dr. Kippels's opinions in Plaintiff's favor were based on sympathy for her or a desire to avoid conflict. That supposition is simply rank speculation, and similar language has been roundly rejected by other courts. *See Sullivan v. Colvin*, No. 12-cv-04033, 2013 WL

2155115, at *5 (W.D. Ark. 2013) ("[T]here is nothing in the record, nor does the ALJ refer to any evidence which in anyway suggests [the treating doctor's] findings are in some way attributed to sympathy she might have to Plaintiff or were the result of some type of physician/patient tension. To make such a finding is pure speculation on the part of the ALJ."); *Tully v. Colvin*, 943 F.Supp.2d 1157, 1168 (E.D. Wash. 2013) (rejecting similar language when the ALJ "points to no evidence of actual impropriety" on part of treating doctor); *Trujillo v. Astrue*, No. 12-cv-89, 2013 WL 706270, at *5 (D. Utah 2013) ("[T]he ALJ's boilerplate statements that [the treating doctor] may have sympathized with the Plaintiff and satisfied her requests for an opinion regarding her disability in order to avoid unnecessary doctor-patient tension constitutes improper speculation and inadequate lay opinion judgment by the ALJ").

The ALJ's other rationales for wholly rejecting Dr. Kippels's opinions also are not supported by substantial evidence and indeed appear to be standard boilerplate language as noted by Plaintiff.  First, Dr. Kippels's opinions were supported by and consistent with his treatment notes, which repeatedly noted Plaintiff's complaints of fatigue, pain with activity, tender points, and problems with cognition.  Doc. 8-8 at 23, 53-55, 61-62, 88-90.  Contrary to the ALJ's finding, Dr. Kippels thoroughly explained the basis for his opinions in both his letter in support of Plaintiff's disability claim, Doc. 8-8 at 23-30, and in the Multiple Impairment Questionnaire he completed, Doc. 8-8 at 89-95, and permissibly described the way in which he believed her activities were limited.

The only evidence in the record that contradicts the opinions of Dr. Kippels is the reports from two non-examining state agency medical consultants, but those findings do not constitute substantial evidence sufficient to uphold the ALJ's decision.  *See Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001) (holding that it was error for the ALJ to reject treating source opinions for

the opinions provided by a non-examining expert); *Newton*, 209 F.3d at 456-457, 460 (holding

that testimony from a non-examining medical expert is not substantial evidence sufficient to

warrant rejection of a treating specialist's testimony).  Because the ALJ failed to point to any

other substantial evidence in the record that contradicts the opinions of Dr. Kippels, Plaintiff's

treating specialist, the ALJ should have given controlling weight to that doctor's opinion.  *See* 20

C.F.R. § 404.1527(c)(2) (the Commissioner must give controlling weight to a treating

physician's opinion that is "well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in your case

record"); Social Security Ruling ("SSR") 96-2p (1996 WL 374188) (a well-supported opinion

from a treating source that is not contradicted by other substantial evidence in the record must be

adopted).  Accordingly, Plaintiff is entitled to summary judgment on this issue.

## IV.  CONCLUSION

For the foregoing reasons, it is recommended that Plaintiff's *Motion for Summary*

*Judgment*, Doc. 10, be **GRANTED**, Defendant's *Motion for Summary Judgment*, Doc. 12, be

**DENIED**, and t**he** Commissioner's decision be **REVERSED AND REMANDED**.

SO RECOMMENDED on March 3, 2015.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE